UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

SHANDAN WARD,                    )
                                 )
        *Plaintiff,*             )
                                 )        No. 3:18-CV-113
v.                               )
                                 )        Judge Collier
SEVIER COUNTY GOVERNMENT,        )        Magistrate Judge Guyton
                                 )
        *Defendant.*             )

# M E M O R A N D U M

Before the Court is Defendant's motion for summary judgment. (Doc. 19.) Plaintiff has

filed a response in opposition (Doc. 22), and Defendant has filed a reply (Doc. 26). For the reasons

outlined below, the Court will **GRANT** Defendant's motion.

## I.      BACKGROUND

On December 12, 2015, Plaintiff went on continuous leave from her job at the Sevier

County Sheriff's Office under the Family Medical Leave Act ("FMLA") to give birth to her second

child. (Doc. 1 ¶¶ 8, 12, Doc. 1-4.) Prior to taking leave, Plaintiff had worked as a Patrol Officer

on day shift for six years, though she had been assigned to a position with reduced hours since July

1, 2015, due to her pregnancy. (Doc. 1 ¶¶ 13–15.) After nearly ten weeks on FMLA leave, Plaintiff

contacted Defendant requesting to return from leave early. (Doc. 1 ¶¶ 16, 18, Doc. 20 ¶¶ 4–5.[1])

Plaintiff also asked to work temporarily in a position with fewer hours because her newborn had

---

[1] Plaintiff has objected to the use of Captain Stephanie Hodges's affidavit, contending it
contains inadmissible hearsay evidence. (Doc. 23.) While the Court agrees it cannot consider
inadmissible evidence in deciding Defendant's motion for summary judgment, the portions of
Captain Stephanie Hodges's affidavit based on her own observations or containing admissible
hearsay statements can be considered. *See* Fed. R. Evid. 602, 701, 801, 803; Fed. R. Civ. P. 56(c).
Accordingly, the Court will limit its consideration of Captain Stephanie Hodges's affidavit to the
portions containing her personal observations or admissible hearsay statements.

colic and Plaintiff was not sleeping well at night. (Doc. 1 ¶ 18.) Defendant granted her request to return early to a temporary position with fewer hours and extended the request to four weeks. (Doc. 1 ¶ 18.) Plaintiff returned from FMLA leave on February 22, 2016, and began working an eight-hour day shift as Visitation Corrections Officer at the main jail facility. (Doc. 1 ¶ 19.) Plaintiff states it was her intent at the end of the four weeks to return to her twelve-hour day shift Patrol Officer position. (Doc. 22 at 2.)

The day before the end of the four weeks, on March 21, 2016, Plaintiff was brought in for a re-evaluation meeting. (Doc. 1 ¶ 20.) Plaintiff alleges she was informed at this meeting that Defendant could no longer hold her day shift Patrol Officer position open and now the only jobs available included a night-shift Patrol Officer position, a day-shift Corrections Officer position, or a day-shift Visitation Officer position. (Doc. 1 ¶¶ 21, 26.) Defendant alleges Plaintiff broke down crying at the meeting and explained she would not be able to handle a twelve-hour patrol shift, and thus was offered the option of remaining in the Visitation Corrections Officer position. (Doc. 21 at 3.) Both parties agree that Plaintiff had until March 28, 2016, to inform Defendant which position she would select. (Doc. 1 ¶ 27, Doc. 21 at 3.)

On March 29, 2016, Plaintiff alleges she complained to Chief McMahan that the job options she was provided were in violation of the FMLA. (Doc. 1 ¶ 28.) The next day, Plaintiff attended another meeting with Sheriff Seals, Chief Michael Hodges, Chief McMahan, and Captain Stephanie Hodges. (Doc. 1 ¶ 29, Doc. 21 at 4.) At this meeting, Plaintiff was instructed to go home because she would be starting on the night shift as a Patrol Officer the following evening. (Doc. 1 ¶ 30, Doc. 21-2 at 3.) Plaintiff responded that she did not feel comfortable working the night shift because she had vision issues that made it difficult to drive at night. (Doc. 1 ¶ 30, Doc. 20 ¶ 17.) Sheriff Seals and Chief Michael Hodges requested she provide a doctor's note regarding

her vision issues immediately.  (Doc. 1 ¶ 33, Doc. 20 ¶ 18.)  Plaintiff alleges she was then forced to take sick leave until she provided a doctor's note.  (Doc. 1 ¶ 33.)

Soon after the meeting, Plaintiff retained an attorney.  Plaintiff's attorney sent a certified letter to Sheriff Seals on April 7, 2016, detailing Plaintiff's complaints of FMLA violations and sex and pregnancy discrimination.  (Doc. 1-1.)

On April 11, 2016, Plaintiff received an email from Chief Michael Hodges inquiring as to the status of her doctor's note.  (Doc. 21-4.)  The email explained if a doctor's note was not received by the close of business, Plaintiff's employment would be terminated.  (*Id.*)  Later that day, Plaintiff provided a doctor's note.  (Doc. 21-3.)  At this point, Plaintiff had been on leave since March 30, 2016.  (Doc. 1 ¶¶ 33, 46.)  Communications between counsel eventually resulted in an agreement that Plaintiff would return to work on May 2, 2016, as a Visitation Officer on day shift at the Jail Annex.  (Doc. 1 at ¶ 46; Doc. 20 at 5.)  Plaintiff worked as a Visitation Officer at the Jail Annex without incident from May 2, 2016, until September 2016.

On September 23, 2016, Plaintiff received a private Facebook message from Adrienne Foster, a relative of Roy and Lonnie Gambill.  (Doc. 22-1 at 33.)  Ms. Foster asked why Roy Gambill was moved from the jail that day.  (*Id.* at 27.)  Plaintiff responded that she did not know why he was moved and stated Lonnie Gambill, another inmate, had also been moved to the main jail because he cursed at Plaintiff and threw a stool at the door.  (*Id.* at 28.)  Defendant suspended Plaintiff on September 28, 2016, and on October 11, 2016, Plaintiff was informed she was being terminated because she disclosed "security information" about the transfer of two inmates and one of the inmate's behavior before he was transferred.  (Doc. 1 ¶ 90, Doc. 1-5, Doc. 20 at 5.)

On March 20, 2018, Plaintiff filed suit against Defendant Sevier County Government, raising claims of discrimination on the basis of sex, pregnancy, and disability, claims of retaliation

for previous complaints of discrimination and requests for reasonable accommodations, and claims of FMLA interference and retaliation. (Doc. 1.) On August 16, 2019, Defendant filed a motion for summary judgment, contending Plaintiff's claims fail as a matter of law. (Doc. 19.) Plaintiff has filed a response in opposition (Doc. 22), and Defendant has filed a reply (Doc. 26).

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing no genuine issue of material fact remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

If the moving party meets its initial burden, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). A genuine issue for trial exists if there is "evidence on which the jury could reasonably find for the plaintiff." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (internal quotations omitted). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson*, 477 U.S. at 248–49. The court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907

(6th Cir. 2001).  If the court concludes, based on the record, that a fair-minded jury could not return a verdict in favor of the non-movant, the court should grant summary judgment.  *Anderson*, 477 U.S. at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.    DISCUSSION

### A.    Title VII Claims

Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, prohibits sex discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).   Title VII also prohibits discriminating against any employee for "oppos[ing] any practice made an unlawful employment practice by this subchapter[.]"  42 U.S.C. § 2000e-3(a).

Here, Plaintiff alleges Defendant discriminated against her because of her pregnancy and retaliated against her for complaining about Defendant's unlawful practices.  (Doc. 1.)  Defendant contends both claims fail as a matter of law.  (Doc. 21.)  The Court will first consider Plaintiff's pregnancy discrimination claim and will then consider her retaliation claim.

#### 1.  Pregnancy/Sex Discrimination

A claim for pregnancy-based sex discrimination can be shown "either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas*." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

Because Plaintiff has not alleged a workplace policy, practice, or decision relied expressly on a protected characteristic, the Court will evaluate her claim using the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework,

> [f]irst, the plaintiff has the burden of proving a prima facie case of discrimination. . . . The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. . . . If the defendant is able to articulate such a reason, the plaintiff then carries the burden of proving that reason to be a mere pretext for discrimination.

*Ensley–Gaines v. Runyon*, 100 F.3d 1220, 1224 (6th Cir. 1996) (internal citations omitted).

A prima facie case of pregnancy discrimination is established by showing "(1) [plaintiff] was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000).

Defendant claims Plaintiff cannot meet the elements for a prima facie case of discrimination because she was not pregnant when she was fired and there is no nexus between her pregnancy and her termination. (Doc. 21.) Defendant contends that even if Plaintiff could prove a prima facie case, Defendant had a legitimate, non-discriminatory reason for her termination, namely that she violated the Sevier County Sheriff's Office's policies and procedures by sharing information regarding the location of certain inmates in the jail. (*Id.*)

In response, Plaintiff asserts it is irrelevant if she was pregnant at the time of her termination so long as the termination was because of her pregnancy. (Doc. 23 at 13 n.16.) Plaintiff further contends Defendant's actions after she returned from FMLA leave provide sufficient evidence of causation to survive summary judgment. (*Id.* at 17.)

Plaintiff has established the first three elements of a prima facie case of pregnancy discrimination. There is no dispute Plaintiff was qualified for her job and was terminated. (Doc. 21 at 8, Doc. 23 at 13.) Further, it is irrelevant whether Plaintiff was pregnant at the time of the discrimination if Plaintiff demonstrates she was discriminated against because of her pregnancy.

*See Kubik v. Cent. Mich. Univ. Bd. Of Trustees*, 717 F. App'x 577, 581 (6th Cir. 2017) (explaining a gap of five months between the end of a pregnancy and the adverse action did not automatically bar pregnancy discrimination claim).

Thus, the Court need only decide whether a reasonable jury could find Plaintiff has demonstrated a nexus between her pregnancy and her termination.

To establish a nexus between her pregnancy and her termination, Plaintiff must provide evidence of a causal link between them. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006). Temporal proximity alone is usually insufficient to demonstrate a nexus unless the adverse action occurred soon after the pregnancy. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (explaining the adverse action must occur "very close in time after an employer learns of a protected activity" to establish a causal link); *see also Asmo*, 471 F.3d at 594 (holding two months between pregnancy and termination was sufficient to establish a causal link). Absent a close temporal proximity, a plaintiff must provide other evidence of a causal connection such as evidence "that another employee who is similarly situated in her or his ability or inability to work received more favorable benefits[,]" *Ensley-Gaines*, 100 F.3d at 1226, or evidence of disparaging comments by decision-makers about the plaintiff's pregnancy, *Figgins v. Advance Am. Cash Advance Ctrs. Of Mich., Inc.*, 476 F. Supp. 2d 675, 688 (E.D. Mich. 2007).

Here, Defendant was aware of Plaintiff's pregnancy by July 1, 2015, at the latest, but did not fire Plaintiff until October 11, 2016—over a year later. *See Asmo*, 471 F.3d at 594 (explaining temporal proximity is measured from the date when the employer first learned of the pregnancy). As a result, too much time elapsed between Plaintiff's pregnancy and her termination to allow the Court to draw an inference of causation from temporal proximity alone. *See Parnell v. West*, 114 F.3d 1188 (Table), 1997 WL 271751, at *3 (6th Cir. 1997) (explaining temporal proximity is

typically accepted as evidence of a nexus when fewer than six months have elapsed between the pregnancy and adverse action). Thus, Plaintiff must offer other evidence of a causal connection between her pregnancy and her termination.

In her response to the motion for summary judgment, Plaintiff lists several instances of purported discrimination or retaliation, which she asserts "more than satisfy[y] the causation requirements under Title VII, the FMLA, and ADA." (Doc. 23 at 17.) Specifically, Plaintiff contends (1) she was moved to night shift against her will; (2) Sheriff Seals, Chief McMahan, and Chief Michael Hodges became angry with her after she complained about her treatment upon her return; (3) she was forced to take unpaid sick leave; (4) she was informed "higher ups" were angry with her; (5) she was passed over for promotions because Sheriff Seals was angry with her; and (6) she was terminated for a "trumped-up" reason because she had been previously instructed she could share inmate location information and other employees had done so without discipline. (*Id.*)

Because Plaintiff does not indicate which of the alleged instances of discrimination and retaliation are related to establishing causation for her pregnancy discrimination claim, the Court will consider all of them.

Plaintiff contends Defendant moved her to night shift against her will after she returned from FMLA leave, which she asserts is discriminatory, "especially when there is evidence Defendant treated male officers differently." (Doc. 23 at 14–15.) The Court finds Defendant's decision to assign Plaintiff to night shift does not provide evidence of pregnancy discrimination.

First, Plaintiff was not forced to work night shift immediately upon her return from FMLA leave. Rather, Plaintiff requested and was granted a temporary position working fewer hours for one month after her return from leave. (Doc. 1 ¶ 18, Doc. 20 ¶¶ 7, 9.) At the end of the month, Defendant informed Plaintiff it could no longer keep her day-shift Patrol Officer position open and

offered her other positions to choose from, including a night-shift Patrol Officer position and one or two other day-shift positions. (Doc. 1 ¶¶ 21, 26, Doc. 21 at 3.) Plaintiff failed to timely select any of the positions offered. (Doc. 1 ¶ 27, Doc. 21 at 3.) Defendant then instructed her to prepare for night shift as a Patrol Officer. (Doc. 1 ¶ 30, Doc. 21-2 at 3.) While Defendant has not explained why it chose to assign her to the night-shift position out of the other positions offered, there is no evidence to suggest Defendant assigned Plaintiff to night shift because of her pregnancy, and Plaintiff has not offered any facts to connect this decision to her pregnancy.

Further, Plaintiff's assertion that "there is evidence Defendant treated male officers differently" is unsupported by any actual evidence of differential treatment. Plaintiff asserts in her complaint that "[d]uring Plaintiff's employment, Day Shift positions were created and/or accommodated at the request of male Deputies[,]" but fails to provide any specific instances where this occurred. (Doc. 1 ¶ 39.) Plaintiff cannot rely merely on assertions that evidence of differential treatment exists; she must come forth with specific facts of such treatment which would cause a reasonable jury to find in her favor. *See Chao*, 285 F.3d at 424. Because of the lack of a connection to her pregnancy and the lack of evidence of differential treatment, a reasonable jury could not infer a causal link between Plaintiff's pregnancy and her termination based on her assignment to night shift.

Plaintiff next contends Sheriff Seals, Chief McMahan, and Chief Michael Hodges became angry with her after her attorney sent a letter outlining her complaints and after she complained Defendant was treating her differently than male employees. (*Id.* at 15.) Plaintiff cannot merely conclude they were angry with her; she must provide evidence to demonstrate how she would have personal knowledge of their states of mind. *See Granberry v. Baptist Mem'l Hosp.*, 145 F.3d 1331

(Table), 1998 WL 279377, at *5 (6th Cir. 1998) (explaining a witness's conclusive statements about another person's thoughts or state of mind is inadmissible).

The only evidence Plaintiff provides in support of this contention is an email she received from Chief Michael Hodges, which she classifies as "threatening" and a "clear response to Ward complaining of discrimination and for retaining an attorney." (*Id.*) However, nothing in the email reveals anger towards Plaintiff for hiring an attorney or complaining about differential treatment. The email discusses Plaintiff's failure to timely provide a doctor's note regarding her vision issues, requests she provide the note immediately, and acknowledges Plaintiff has retained an attorney. (Doc. 21-4.) The email does not mention Sheriff Seals or Chief McMahan, and does not provide any evidence they were angry with her because she raised complaints and hired an attorney. As a result, there is no evidence to support Plaintiff's assertion that Sheriff Seals, Chief McMahan, and Chief Michael Hodges were angry with her. In addition, Chief Michael Hodges's email does not mention or reference Plaintiff's pregnancy, and Plaintiff has failed to provide any evidence linking the email to her pregnancy or her termination. Thus, the email does not demonstrate that a causal link exists between Plaintiff's pregnancy and her termination.

Plaintiff then asserts she was forced to take unpaid sick leave to obtain a doctor's note regarding her vision issues. (Doc. 23 at 15.) She asserts being forced to take sick leave when she was not sick was discriminatory and the refusal to pay her for the sick leave "is directly related to her sex, pregnancy, maternity/FMLA leave, and her complaints of discrimination and retaliation and her requests for a reasonable accommodation[.]" (*Id.* at 16.) Defendant agrees Plaintiff was placed on Leave Without Pay status, but does not address Plaintiff's contention that she was forced to take sick leave. (Doc. 21 at 4.) Even assuming Plaintiff was forced to take leave to obtain a doctor's note, Plaintiff has not indicated how this action is related to her pregnancy beyond stating

the two are directly related. (*See* Doc. 23.) Unsupported assertions are not sufficient to demonstrate there is a genuine issue of material fact for trial. *See Chao*, 285 F.3d at 424. Here, it appears the unpaid leave related only to her request for accommodations for her vision issues and was not connected in any way to her pregnancy or termination. Plaintiff has not offered any facts to the contrary.

Plaintiff also asserts she was informed by numerous employees that "she had 'pissed off' the 'higher-ups'" as a result of her complaining about her treatment upon return from FMLA leave. (Doc. 23 at 16.) As an initial matter, the out-of-court statements of the other employees constitute hearsay evidence under Federal Rule of Evidence 801 and Plaintiff has not offered any exceptions rendering them admissible.[2] *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir.1994) (explaining hearsay evidence cannot be considered on summary judgment). Even if the statements were admissible, they appear to be based on the other employees' evaluations of the states of mind of the "higher-ups." All Plaintiff alleges she was told by other employees was that the "higher-ups" were "pissed off" at her, which is a subjective judgment about another person's state of mind, namely how the "higher-ups" felt about Plaintiff. Thus, the statements by the other employees constitute inadmissible speculation, *see Granberry*, 1998 WL 279377, at *5, and cannot be considered in deciding the motion for summary judgment. *See* Fed. R. Civ. P. 56.

Plaintiff further claims she was passed over for several promotions due to discrimination and retaliation. (Doc. 23 at 16.) In support of this assertion, Plaintiff contends her supervisors

---

[2] While the statements could be admissible as statements by an opposing party's employee under Rule 801(d)(2)(D), it is unclear if the statements are "on a matter within the scope" of the declarants' employment. *See* Fed. R. Evid. 801(d)(2)(D); *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 (6th Cir. 2012) (explaining Rule 801(d)(2)(D) only allows admission of statements within the scope of the declarant's employment). Plaintiff did not address the admissibility of these statements or provide any facts to demonstrate that the content of the statements satisfies the scope requirement of Rule 801(d)(2)(D).

told her she would not get promotions "because Sheriff Seals was angry with her." (*Id.*) These statements are also based on inadmissible speculation regarding Sheriff Seals's state of mind and thus cannot be considered by the Court. *See* Fed. R. Civ. P. 56. Plaintiff has not provided any other facts to support her assertion that she was passed over for promotions due to discrimination and retaliation and has not provided any evidence linking the lack of promotions to her pregnancy and termination. Thus, her contention regarding promotions does not provide evidence of a causal link between her pregnancy and her termination.

Finally, Plaintiff contends her termination was "trumped-up" in part because she had been instructed by her supervisors that she could provide an inmate's location. (Doc. 23 at 9.) However, Plaintiff has not provided any facts regarding what she was specifically instructed was permissible. It is undisputed that Defendant had a written policy prohibiting unauthorized communications about inmates. (Doc. 21-8.) Plaintiff appears to acknowledge there were limits to the information employees could provide given that she contends other employees violated the unauthorized-communications policy by sharing information about inmates. (*See* Doc. 23 at 9.) Thus, even construing the evidence in Plaintiff's favor, all the Court can reasonably infer is that Plaintiff was permitted to provide inmate location information in certain circumstances. Plaintiff has not provided sufficient information for the Court to infer such circumstances included location information provided to an inmate's relative via Facebook messenger, nor that such information could be provided shortly after an inmate is moved. Further, Plaintiff did not just share an inmate's location, she also described an inmate's behavior in the jail. Plaintiff has not claimed it is permissible to share an inmate's behavior in the jail with a member of the public under any circumstances. Thus, Plaintiff's assertion that her termination was contrary to her training is

unsupported by the record and insufficient to support a causal link between Plaintiff's pregnancy and her termination.

Plaintiff also alleges the reason for her termination was "trumped-up" because other employees violated the same policy without facing any discipline. (Doc. 23 at 9.) Plaintiff provides the names of other employees she alleges violated the same policy, but she does not set out any facts describing what those employees did. (*Id.*) The only discussion of particular facts of similar incidents appears in Plaintiff's statement of the facts, where she references other employees' misconduct and cites to her affidavit. (*Id.* at 11 n.14.) In Plaintiff's affidavit, she sets out seven instances where other employees engaged "in the same or worse conduct that [Plaintiff] allegedly engaged in." (Doc. 22-1 at 13–14.) For each alleged incident, Plaintiff names the individuals involved, briefly states what they did, concludes their actions violated Defendant's policies, and explains how they were punished, if at all. (Doc. 22-1 at 13–14.)

However, Plaintiff fails to provide sufficient details for the Court to determine if "a comparable non-protected person was treated better" than Plaintiff to support a causal link. *See Ensley-Gaines*, 100 F.3d at 1224. For example, Plaintiff does not explain whether the other employees violated the same policy Plaintiff was terminated for violating. The only incident Plaintiff alleges involved inmate location information fails to provide any details of the actual information disclosed by the other employee, when it was disclosed to the inmate's family, and whether the employee was authorized to disclose the information. (*See* Doc. 22-1 ¶ 64c.) The Court cannot determine whether other employees were treated more favorably than Plaintiff if it is unclear whether they even engaged in the same misconduct. As a result, the other employees' alleged misconduct does not provide evidence linking Plaintiff's pregnancy to her termination.

Even assuming Plaintiff could establish a prima facie case of pregnancy discrimination, Defendant has provided a legitimate, non-discriminatory reason for Plaintiff's termination; she provided information about inmates in violation of Defendant's policies and procedures.  (Doc. 21.)

Plaintiff, then, has the burden "of proving that the proffered reason for the action was merely a pretext for discrimination."  *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997).  "To demonstrate pretext, a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful."  *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (emphasis in original).  A plaintiff can demonstrate pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's actions, or (3) that they were insufficient to motivate the employer's actions."  *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (internal quotations and citations omitted).

Plaintiff first contends Defendant's reason for her termination has changed, providing strong evidence of pretext.  (Doc. 23.)  Plaintiff asserts Defendant originally claimed her termination was because she disclosed inmate movement and an inmate's behavior before he was transferred.  (*Id.*)  Plaintiff contends Defendant then removed the "before he was transferred" language from its motion for summary judgment because there was no factual basis for asserting Plaintiff disclosed the information before the inmate was transferred to the main jail.  (*Id.*)  In response, Defendant contends there has been no changing rationale for Plaintiff's termination.  (Doc. 26.)  Defendant contends Plaintiff was terminated for sharing information about inmates via Facebook messenger, which violated the Sevier County Sheriff's Office's policies and procedures

and was a safety violation because the information could have been utilized to facilitate an escape. (*Id.*)

A changing rationale for an adverse employment action can constitute evidence of pretext. *See, e.g., Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) (explaining that "[s]hifting justifications over time calls the credibility of those justifications into question").

Here, the justification for Plaintiff's termination has not changed. Plaintiff's argument focuses on the elimination of the phrase "before he was transferred" in Defendant's motion for summary judgment. (Doc. 23.) However, the removal of this language does not change the core justification offered for Plaintiff's termination. In the cases Plaintiff cites in support of her argument, the employer offered categorically different reasons for the adverse action, thus providing clear evidence of pretext. *See Cicero*, 280 F.3d at 592 (explaining the employer never mentioned the plaintiff's poor performance as a reason for his discharge until the lawsuit was filed and then changed its justifications for his termination two additional times over the course of litigation); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) (explaining the employer never mentioned poor performance as a reason for not hiring plaintiff full time until discovery and the evidence demonstrated his work was satisfactory). In contrast, Defendant has never wavered from its explanation offered in Plaintiff's dismissal letter: Plaintiff violated its policies and procedures by providing information about inmates via Facebook messenger. (*See* Doc. 21, Doc. 22-1 at 41, Doc. 22-1 at 43.) Thus, there is no evidence of a shifting justification for Plaintiff's termination to call its credibility into question.

Plaintiff next contends there is a question of fact as to whether she actually violated Defendant's policy as there is no evidence to suggest she sought to aid in an escape or that an escape was actually attempted. (Doc. 23.) This contention appears to misinterpret the plain

language of Defendant's unauthorized-communications policy. The policy does not require an employee to intend to assist in an escape or for an escape to be attempted as a result of the information provided. Rather, the policy states, "Employees shall not communicate information that *may* delay arrest or aid a person to escape, destroy evidence, or remove stolen property. They shall not reveal any case information except by permission of the Supervisor." (Doc. 21-8 (emphasis added).) Because the inmate location information Plaintiff provided could have aided in an escape, there is no question of fact regarding whether Plaintiff violated the policy.

Plaintiff further asserts other employees' similar conduct did not result in termination and Plaintiff's record supports a less severe punishment for her allegedly violating Defendant's policies. (*Id.*) Defendant contends the actions of other employees do not minimize Plaintiff's actions nor show evidence of pretext. (*Id.*) Defendant also asserts Plaintiff's Internal Affairs Investigative Files demonstrates Plaintiff had previous conduct issues, thus negating her contention that her record warranted a less severe punishment. (*Id.*)

Plaintiff's contention regarding other employees' conduct appears to be an attack on whether her misconduct was sufficient to justify her termination. To prove misconduct was insufficient to justify termination, a plaintiff generally must provide "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). In evaluating such evidence, the court compares the "severity" and "commonality" of the employees' conduct. *See Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 780 (6th Cir. 2016).

As discussed previously, Plaintiff has not provided sufficient information regarding the other incidents for the Court to compare them to Plaintiff's actions. For example, Plaintiff has not described the incidents in sufficient detail to determine if the other employees engaged in substantially identical conduct and failed to state the result of the other employees' violations, if any. Thus, the Court can only speculate as to whether their actions were equally or more severe than Plaintiff's and whether such violations were common enough to demonstrate Plaintiff's misconduct was insufficient to support her termination.

Further, Plaintiff fails to offer evidence to support her argument that she should have been punished less severely. While Plaintiff did not have significant disciplinary issues before this incident, she has failed to provide details regarding Defendant's progressive discipline policy. Plaintiff merely asserts her situation should have been handled differently under the policy and indicates the policy includes evaluation of mitigating facts. The Court is without any specific information regarding how the progressive discipline policy is implemented and whether Defendant is required to follow it in all circumstances. Even construing the evidence in the light most favorable to Plaintiff, the Court is unable to determine whether Plaintiff's termination was actually contrary to Defendant's progressive discipline policy.

Finally, Plaintiff contends a reasonably jury could find Defendant conducted a "sham" investigation by failing to interview her before concluding she violated the policy. (Doc. 23.) Plaintiff contends she was interviewed in the past when she was accused of a policy violation and thus she should have been interviewed here. (*Id.*) However, Plaintiff's assertion is contradicted by her Internal Affairs Investigative Files. While it does appear Plaintiff was interviewed regarding incidents alleged in January 2009 and October 2013, there is no evidence she was interviewed following allegations made in July and October 2015. (Doc. 26-2.) Plaintiff has failed

to establish an interview was required as part of the investigation and has not offered any other evidence to support her assertion that the investigation was a "sham."

As a result, Plaintiff has failed to demonstrate Defendant's proffered reason for her termination was a pretext for discrimination. Accordingly, the Court will grant Defendant's motion for summary judgment on the claim of pregnancy discrimination.

### 2. Title VII Retaliation

A prima facie claim of Title VII retaliation requires a plaintiff to prove "(1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568 (6th Cir. 2019) (internal quotations and citations omitted).

Plaintiff alleges she complained to her superiors about her treatment upon returning from FMLA leave (Doc. 1), which is confirmed by her attorney's letter to Sheriff Seals. (Doc. 1-1.) Plaintiff claims that after she lodged these complaints, she experienced various types of retaliation, ultimately culminating in her termination. (Doc. 23.) Title VII's anti-retaliation provision "protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster*, 746 F.3d at 730 (6th Cir. 2014). Thus, Plaintiff has established the first two elements of a Title VII retaliation case; she engaged in a protected activity, which was known to her employer. The parties also do not dispute Plaintiff has established the third element, a materially adverse action, because Plaintiff was terminated. (Doc. 21 at 8, Doc. 23 at 13.)

However, Defendant asserts Plaintiff cannot establish a causal connection between the protected activity and the materially adverse action because Plaintiff's termination was due to her violation of the Sheriff's Office's policies and procedures. (Doc. 21.)

As discussed above, Plaintiff has provided several instances of purported discrimination or retaliation, which she asserts satisfies causation. (Doc. 23 at 17.)

Unlike Title VII discrimination claims, "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2516, 2533 (2013)).

Plaintiff first asserts Defendant forced her to work night shift, which she contends was discriminatory. As previously discussed, Defendant's decision to assign Plaintiff to night shift occurred after Plaintiff was granted a temporary position with fewer hours and then failed to select one of the alternative positions she was offered when Defendant could no longer hold her prior position open. Plaintiff has not offered any facts to demonstrate these actions were discriminatory. Further, Plaintiff never actually worked the night-shift assignment, instead she was ultimately assigned to a day-shift Visitation Officer position, where she remained for over five months before her termination. Plaintiff has not articulated or provided any facts to explain how her assignment to night shift demonstrates her termination would not have occurred but for Defendant retaliating against her for lodging complaints. Thus, the Court finds the night-shift assignment does not support causation.

Plaintiff claims next that the email from Chief Michael Hodges regarding the doctor's note constitutes a clear retaliatory response to her complaints and decision to retain an attorney. (Doc.

23.)  However, the email is devoid of any connection to her complaints.  Chief Michael Hodges's email sets out the lack of communication from Plaintiff regarding the doctor's note she was supposed to provide and requests her to provide the note.  (Doc. 21-4.)  The only mention of her retaining an attorney is an acknowledgment of that fact and that Chief Michael Hodges would not communicate with her directly as a result.  (*Id.*)  There is no evidence that the email was sent in retaliation for her complaints or that it is in any way connected to her complaints, and Plaintiff has not provided any facts to indicate otherwise.

Similarly, Plaintiff has not provided any evidence to support her claim that she was forced to use unpaid leave as a result of her making complaints about Defendant's alleged unlawful practices.  (Doc. 23.)  Plaintiff expressly acknowledges that she was placed on leave to obtain a doctor's note regarding her night vision issues.  (*Id.* at 5.)  Plaintiff has not offered any evidence connecting her unpaid leave to her complaints about her treatment aside from concluding the action constituted retaliation for her complaints.  (*Id.*)  The record also demonstrates the decision to place Plaintiff on unpaid leave did not impact Plaintiff's termination as Plaintiff worked for over five months as a day-shift Visitation Officer after she returned from the unpaid leave.  Plaintiff has not provided any facts to suggest Defendant's decision to place Plaintiff on unpaid leave supports causation for her Title VII retaliation claim.

Finally, Plaintiff claims her termination was based on a "trumped-up" reason because she was trained it was acceptable to provide the location of inmates and other employees violated the same policy, but were not fired.  (Doc. 23 at 9.)  As discussed above, Plaintiff's contentions regarding her training are contradicted by the written policy and her arguments regarding other employees' actions.  In addition, Plaintiff has not provided sufficient information regarding the

other employees' actions for the Court to determine whether Plaintiff's termination would not have occurred but for Defendant's unlawful actions.

Even assuming Plaintiff could demonstrate a prima facie case of Title VII retaliation, Defendant has provided a legitimate, non-discriminatory reason for Plaintiff's termination, namely she provided information regarding certain inmates in violation of Defendant's policies and procedures. The Court has already addressed and dismissed Plaintiff's arguments regarding pretext as it applied to her pregnancy discrimination claim, and Plaintiff has not provided any additional evidence of pretext related to her Title VII retaliation claim. As a result, Plaintiff has not established Defendant's proffered reason was mere pretext for discrimination, and thus Defendant's motion for summary judgment will be granted.

### B.     FMLA Claims

Under the FMLA, qualifying employees are entitled to "up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)). If the employee returns to work within that period, he or she is entitled to be reinstated to his or her original position or placed in "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1).

Covered employers are prohibited "from interfering with, restraining, or denying the exercise of their employees' rights under the statute[.]" *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). Employers are also prohibited from discharging or discriminating "against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. §§ 2615(a)(1), (a)(2), (b).

Here, Plaintiff has alleged claims of both FMLA interference and retaliation.  (Doc. 1.)

## 1. FMLA Interference

"Under the entitlement theory (which some courts refer to as the interference theory), '[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave.'"  *Edgar*, 443 F.3d at 507 (quoting *Arban v. West Pub. Co.*, 345 F.3d 390, 400–01 (6th Cir. 2003)).  To establish an interference claim, a plaintiff "must prove that: (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled."  *Id.*

There is no dispute that Plaintiff satisfies the first four elements to establish an FMLA interference claim.  (Docs. 21, 23.)  Thus, the only question is whether a reasonable jury could find Plaintiff was denied FMLA benefits to which she was entitled.

Plaintiff began her leave on December 12, 2015, which she could have remained on until March 2016.  *See* 29 U.S.C. § 2614(a)(1).  Instead, Plaintiff reached out to Defendant before her twelve weeks of leave expired and requested to return from leave early.  Under the FMLA, Plaintiff was entitled to reinstatement to the same or an equivalent position when she returned from leave.  *See* 29 CFR § 825.214.  Thus, if she had sought to return to her day shift Patrol Officer position when she returned from leave on February 22, 2016, Defendant would have been required to reinstate her to that position or an equivalent one.

However, before her return, Plaintiff requested a temporary position with reduced hours.  Under the FMLA, an employer is not prohibited "from accommodating an employee's request to be restored to a different shift, schedule, or position which better suits the employee's personal

needs on return from leave[.]" 29 CFR § 825.215(e)(4). By granting Plaintiff's request for a different position upon return from leave, Defendant provided Plaintiff the FMLA benefits to which she was entitled.

Thus, Defendant did not interfere with Plaintiff's FMLA entitlements, and Defendant's motion for summary judgment on this issue will be granted.

### 2. FMLA Retaliation

The *McDonnell Douglas* burden-shifting test is also applied to retaliation claims under the FMLA. *See Edgar*, 443 F.3d at 508. Accordingly, a plaintiff must demonstrate "(1) she availed herself of a protected right under the FMLA by notifying [the employer] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Id.*

The parties do not dispute Plaintiff has satisfied the first two elements of an FMLA retaliation claim, as Plaintiff notified Defendant of her intent to take FMLA leave (Doc. 21 at 2, Doc. 23 at 3) and she suffered an adverse employment action when she was fired (Doc. 21 at 8, Doc. 23 at 13). Thus, the only issue the Court must resolve is whether Plaintiff has established a causal connection between her taking FMLA leave and her termination.

Defendant contends there is no causal connection between her taking FMLA leave and her later termination. (Doc. 21.) Defendant notes that her termination occurred months after she returned from FLMA leave and the "termination was directly linked to her violations of policy and procedure regarding communications with inmates." (*Id.* at 11.)

As previously discussed, Plaintiff offers several instances of purported discrimination or retaliation to support causation. (Doc. 23 at 17.)

Plaintiff's assertion she was forced to work night shift fails to establish a causal connection between her taking of FMLA leave and her later termination. As the Court has already noted, Plaintiff's reassignment to night shift arose after she requested, and was granted, a temporary position at the jail with fewer hours and then failed to select one of the other positions offered when Defendant could no longer hold her day-shift Patrol Officer position open. Plaintiff has not provided any evidence that her reassignment to night shift was discriminatory or in retaliation for her taking FMLA leave other than stating the reassignment occurred after she returned from FMLA leave. Accordingly, Plaintiff's assignment to night shift does not provide support for a causal link.

Plaintiff's claims regarding Chief Michael Hodges's email and her placement on unpaid leave also fail to support a causal link between her taking FMLA leave and her later termination. As the Court has already described, the content of Chief Michael Hodges's email is focused solely on Plaintiff's failure to provide a doctor's note regarding her vision issues. Plaintiff has failed to explain how this email is discriminatory or evidence of retaliation beyond classifying the email as "threatening." (Doc. 23.) Further, the email is facially unconnected to her taking of FMLA leave as it focuses exclusively on her requesting accommodations for her vision issues. Thus, the email does not provide support for causation. Similarly, Plaintiff's placement on unpaid leave was a direct result of her request for accommodations and failure to provide a doctor's note regarding her vision issues. Plaintiff has not indicated how this decision was connected to her taking FMLA leave or how it provides support for causation.

Finally, Plaintiff argues she was fired for a "trumped-up" reason because she was trained that it was permissible to provide inmate location information and other employees had done so without facing discipline. (Doc. 23.) As the Court has already discussed, Plaintiff's assertion about her training is contradicted by the record and Plaintiff has not provided sufficient

information regarding the other employees' actions for the Court to determine if similarly situated employees were treated more favorably.

Even assuming a prima facie case could be established, Defendant has offered a legitimate, non-discriminatory reason for her termination, and, as discussed previously, Plaintiff has not offered adequate evidence to support her contention that Defendant's proffered reason for her termination was merely pretextual.

As a result, the Court will grant Defendant's motion for summary judgment on Plaintiff's FMLA retaliation claim.

### C.  ADA Claims

Plaintiff alleges her vision issues are a disability under the Americans with Disabilities Act ("ADA") and by failing to accommodate Plaintiff's request to work on day shift, Defendant discriminated against her on account of her disability.  (Doc. 4 at 5.)  Plaintiff also alleges Defendant retaliated against her for requesting reasonable accommodations by placing her on unpaid sick leave.  (*Id.*)

The ADA bars discrimination against a "qualified individual" because of their disability. 42 U.S.C. § 12112(a).  Under the ADA, a "disability" means, "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or being regarded as having such an impairment."  42 U.S.C. § 12102(1).

Defendant contends Plaintiff's ADA claim fails as a matter of law because she does not suffer from any disability.  (Doc. 21.)  Defendant explains that the ameliorative effects of corrective eyewear or lenses may be considered in deciding whether a vision impairment substantially limits a major life activity.  (*Id.*)  Defendant contends Plaintiff's vision issues were

corrected by her eyeglasses and thus her vision issues do not constitute a disability under the ADA. (*Id.*)

In response, Plaintiff notes that an ADA retaliation claim can still be made, even if the claim of disability fails, when a plaintiff has "a reasonable and good faith belief that the opposed act or practice is unlawful under the ADA." (Doc. 23 at 14, n.17 (citing *Barrett v. Lucent Techs.*, 36 F. App'x 835, 840 (6th Cir. 2002).) Plaintiff asserts she had a reasonable and good-faith belief that she had a disability preventing her from safely performing the duties of a night-shift position, requested a reasonable accommodation to work day shift, and suffered retaliation by being forced to go on unpaid sick leave. (*Id.*)

Under the ADA, a court may not consider mitigating measures in determining whether an impairment "substantially limits a major life activity" with the exception of "ordinary eyeglasses or contact lenses." 42 U.S.C. § 12102(4)(E). Here, there is no dispute that Plaintiff was able to correct her vision issues with her eyeglasses (Docs. 21, 23), meaning Plaintiff's vision issues are not a disability under the ADA. As a result, Plaintiff cannot establish a claim of discrimination under the ADA and it will be dismissed.

However, the Court must still determine if her claim of retaliation survives summary judgment. Under the ADA, "[a] plaintiff need not actually be disabled to assert a claim of disability retaliation. The person, however, must have a reasonable and good-faith belief that the opposed act or practice is unlawful under the ADA." *Barrett*, 36 F. App'x at 840 (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir. 2000)). Plaintiff contends she had a good-faith and reasonable belief that she had a disability and was entitled to a reasonable accommodation, but was retaliated against as a result of her request. (Doc. 23.) Defendant does not challenge this contention, but instead Defendant argues that even if Plaintiff did have a good-

faith, reasonable belief, she still cannot prove ADA retaliation. (Doc. 26.) Because Defendant did not contest that Plaintiff had a reasonable and good-faith belief that Defendant's actions were unlawful under the ADA, the Court will assume for the purposes of summary judgment that she did and will evaluate her ADA retaliation claim.

"Retaliation claims are treated the same whether brought under the ADA or Title VII." *Barrett*, 36 F. App'x at 840 (citing *Penny*, 128 F.3d at 415). Plaintiff must show "(1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Hubbell*, 933 F.3d at 568 (internal quotations and citations omitted).

There is no dispute Plaintiff requested to work day shift because of her vision issues when she was told she would be assigned to night shift. (Doc. 1 ¶ 30, Doc. 26 at 4.) "[A] good-faith request for reasonable accommodations" is a protected act for ADA retaliation purposes. *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 777 n.8 (6th Cir. 2011); *see also A.C. ex rel. J.C. v. Shelby Cty. Bd. Of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) ("Both this circuit and most others agree that requests for accommodation are protected acts."). As a result, Plaintiff has established the first two elements of a prima facie case of retaliation.

The third element, an adverse employment action, has also been established. "An adverse employment action requires a loss of pay or benefits, a detrimental change in responsibilities, a negative change in the terms or conditions of employment, or some other actual and unfavorable change in job status." *Barrett*, 36 F. App'x at 841. Plaintiff contends she was forced to take unpaid sick leave to obtain a doctor's note and Defendant states she was placed on Leave Without Pay status, without addressing whether she was forced to take leave. (Docs. 21, 23.) Construing the

evidence in the light most favorable to Plaintiff, she did not work and was not paid from March 30, 2016, when she was told to obtain a doctor's note, until May 2, 2016, when she returned to work. "[I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 73 (2006) (quoting *Mitchell*, 361 U.S. at 292.) Thus, Defendant's decision to not pay Plaintiff from March 30, 2016, until May 2, 2016, constituted an adverse employment action.

Turning finally to the fourth element, the Court must determine whether Plaintiff has demonstrated a nexus between the protected activity and the adverse employment action. In limited circumstances, temporal proximity alone can provide an inference of causation sufficient to support a prima facie case of ADA retaliation. *Mickey*, 516 F.3d at 525 (explaining the adverse action must occur "very close in time after an employer learns of a protected activity"). Here, it is undisputed that Plaintiff informed Defendant of her vision issues at least by March 30, 2016, and requested accommodations in the form of working day shift. (Docs. 21, 23.) Further, from March 30, 2016, until May 2, 2016, Plaintiff was not assigned a position at the jail and was not paid. (Docs. 21, 23.) Given the close proximity of these events, the Court can infer that the request for accommodations was causally connected to the adverse action.

However, Defendant has offered a legitimate, non-discriminatory reason for its actions. Defendant explained that Plaintiff was placed on Leave Without Pay status because of her "complete lack of communication with her employer and ignoring Sheriff Seal[s]'s and Chief[] Hodge[s]'s request to provide a doctor's note the day following their meeting[.]" (Doc. 21 at 4.) Defendant also noted that even day shift would require Plaintiff to work during hours of darkness, thus raising concerns if she could not drive on any shift. (*See id.* at 13.)

Plaintiff, then, has the burden "of proving that the proffered reason for the action was merely a pretext for discrimination." *Penny*, 128 F.3d at 417. "To demonstrate pretext, a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful." *Ford Motor Co.*, 782 F.3d at 767 (emphasis in original).

Plaintiff has not offered any evidence to suggest Defendant's proffered reason for placing her on Leave Without Pay status was not the real reason for its action. (*See* Doc. 23.) The only discussion of pretext is in regards to Plaintiff's argument that Defendant's proffered reason for her termination was pretextual. (*Id.*) Accordingly, Defendant's motion for summary judgment on this issue will be granted.

## IV.     CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendant's motion for summary judgment (Doc. 19).

**An appropriate order will enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**